LAW OFFICES OF MAUREEN GRAVES
Maureen R. Graves (Illinois Bar #6311493)
1326 East Madison Park
Chicago, IL 60615
Phone: 949-466-4248
Fax: 949-856-0168

Attorney for the Plaintiffs,
B.B. and C.B.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| C.B., Student, by his mother B.B., on her own behalf and as next friend of C.B.;<br><br>Plaintiffs,<br><br>vs.<br><br>BOARD OF EDUC. OF CITY OF CHICAGO, DISTRICT 299; ELIZABETH WAGMAN; CHRISTINE MOCK; ILLINOIS STATE BOARD OF EDUCATION and TONY SMITH, Ph.D., in his official capacity,<br><br>Defendants. | **Case No. 1:20-cv-00586**<br><br>**COMPLAINT**<br><br>**20 U.S.C. § 1415(i)(3)**<br>**20 U.S.C. § 1415(f)(3)(A)**<br>**42 U.S.C. § 1983**<br>**29 U.S.C. § 794**<br>**14th Amendment to the Constitution**<br><br>**JURY TRIAL DEMANDED as to Rehabilitation Act and 14th Amenmdnet Claims** |

NOW COME C.B. and B.B., in her own capacity and as parent of C.B., by and through their

attorney, Maureen Graves, and state as follows:

### JURISDICTION, VENUE & EXHAUSTION

1.      Alleged violations of the Individuals with Disabilities Education Act as well as alleged

acts of disability discrimination and retaliation on account of disability-related advocacy

occurred within the Northern District of Illinois, Eastern Division.

2.      An Illinois State Board of Education due process hearing was conducted September 10-
13, 2019. The Impartial Hearing Officer ("IHO") refused to allow briefing, and closing
arguments were submitted at the end of hearing. The IHO's decision was due under Illinois law
on September 27, 2019. On September 30, 2019, a mailed copy arrived at the family's counsel's
office containing a proof of service indicating that it had been sent on September 27, 2019.
Counsel had received no such transmission. This appeal is being filed within 120 days from the
date stated on the decision and proof of service.

## PARTIES

3.      C.B. is a 14-year-old boy who is classified as an eighth grader and currently attends
Gary Comer Middle School, a charter school for which Chicago Public Schools ("CPS" or
"District") is the special education "local education agency." C.B. lives in Chicago and his
education has been the responsibility of CPS since second grade, when he moved to Chicago
from Tennessee.

4.      C.B. was out of school from October 4, 2017 through January 7, 2019, and again from
February 20, 2019 through May 2019. His most recent Individualized Education Program
("IEP") meeting occurred on October 9, 2019, following hearing in this matter. Before that, the
most recent IEP meeting had occurred over three years before, on September 23, 2016.

5.      C.B. has average nonverbal intelligence and a strong interest in science. He hopes to
become an engineer. He qualifies for special education based on speech/language impairment
and specific learning disability and is a person with a disability entitled to protections under
Section 504 of the Rehabilitation Act of 1973.

6.      B.B., C.B.'s mother, is an elementary school reading specialist. She has long worked

with C.B. personally in language, literacy and math development, and has arranged enrichment opportunities, and arranged and did home teaching during the period in which C.B. was out of school. B.B. has also consistently advocated on her son's behalf with CPS and educators.

7. Defendant Board of Education of Chicago Public Schools is the governing board of Chicago Public Schools, District 299, a governmental agency organized and existing under the laws of the State of Illinois and located within Cook County. Defendant is required by federal and Illinois law to provide students such as Plaintiff C.B. with a free appropriate educational program. Defendant is a "local educational agency" within the meaning of 20 U.S.C. § 1401(15) and a recipient of federal funds subject to Section 504 of the Rehabilitation Act of 1973. Defendant hires staff who are aware of their obligations to students with disabilities and yet repeatedly violated those obligations with respect to C.B. and his parents. The Board of Education of Chicago Public Schools is the decision-making body responsible for ensuring the education and safety of all students attending its schools.

8. The Illinois State Board of Education ("ISBE"), headed by State Superintendent of Education Tony Smith, Ph.D., employed IHO Janet Maxwell-Wickett to conduct the administrative hearing in this matter and is responsible for providing the administrative record to the court and to parties in the event that there is related litigation. While typically the role of ISBE in appeals is ministerial—providing the administrative record—in this case, plaintiffs challenge ISBE's actions and omissions, specifically its failure to provide an impartial, adequately trained hearing officer willing and able to apply Illinois and federal statutes and regulations to disputes before her.

9. Defendant Christine Mock is a special education administrator in CPS. She was CPS's liaison to C.B.'s former CPS-funded private special education school—Cove—and is now

liaison to the charter school he attends. She is the person in CPS who appears to have been responsible for his case management from early 2017 to the present.

10.    Defendant Elizabeth Wagman was until recently a lawyer for CPS. It appears that she was the actual primary decisionmaker in C.B.'s education for the 2017-18 and 2018-19 school years.

## PROCEDURAL CONTEXT

11.    At a due process hearing held on September 10-13, 2019, IHO Janet Maxwell-Wickett heard two cases—CPS's defense of its September 2017 assessment of C.B., and B.B.'s claim that CPS failed to provide a free appropriate public education at Cove School from December 6, 2016 through June 2017, and failed to provide any placement from October 4, 2017 through December 19, 2018. The hearing officer ruled against student and parent in both of these consolidated matters.

12.    In addition, the IHO became involved in C.B.'s education in spring 2019 in that she upheld as an appropriate exercise of "stay put" CPS's removal of C.B. from Gary Comer Middle School, a charter which his mother managed to have him attend from January 7, 2019 through February 20, 2019. (He returned on May 7, 2019, pursuant to an interim agreement.) Parent and student challenge that stay put ruling on the grounds that it was contrary to law, unsupported by facts, and resulted in denial of education to C.B. for approximately 2 ½ months in early 2019.

13.    Plaintiffs seek damages for violations by CPS of Section 504 of the Rehabilitation Act of 1973, which bars discrimination against students with disabilities, including failure to provide a free appropriate public education within the meaning of the Rehabilitation Act, as well as retaliation against students or parents for disability related advocacy. Families are not required to try to pursue internal processes in which districts determine whether they have violated Section

504. Parents have exhausted IDEA administrative remedies as required in order to pursue Section 504 claims with similar potential remedies.

14.    Due to the unusual circumstances of this case, plaintiffs seek individual liability for violations of IDEA. No IEP meeting was held for C.B. between September 2016 and October 2019, despite requests by his mother both for IEP meetings and for access to a free appropriate public education C.B.'s education during the 2017-18 and 2018-19 school years was controlled by administrators and lawyers, absent involvement by educators, with the exception of a school psychologist who assessed C.B. in September 2017 and did not know why there was no meeting to discuss her evaluation. The individuals primarily responsible for decision-making appear to have been district representative Christine Mock and former District attorney Elizabeth Wagman.

## EDUCATIONAL BACKGROUND

15.    C.B. received preschool and elementary school special education services in Tennessee. When he moved to Chicago in second grade, CPS claimed not to be able to implement his IEP, but agreed to provide speech-language services only. During fourth grade, CPS assessed C.B., and found that he qualified for special education based on speech-language impairment ("SLI") and specific learning disability ("LD").

16.    Late in fourth grade, following a hard-fought due process matter that was settled, in which defendant Elizabeth Wagman represented CPS, CPS and the parent entered into a settlement agreement in which C.B. began to attend Cove School, a well-regarded separate day school which concentrates on educating students with specific learning disabilities, many of which are accompanied, as for C.B., by broader language impairments.

17.    C.B.'s first year at Cove—his fifth-grade year in 2015-16—came as a relief for his mother. He was happier with school, she backed off from directly instructing him, and she was

5

able to focus on her own education and career.

18.     During C.B.'s sixth grade year (2016-17), his mother began to have significant concerns. The period available under the statute of limitations started December 6, 2016, when C.B.'s education was governed by an IEP developed on September 23, 2016. There has been no IEP meeting since then, though on February 20, 2017 his IEP was revised by consent, without a meeting, to include Extended School Year services for summer 2017.

19.     B.B. expressed numerous concerns about C.B.'s education during spring 2017, and received responses that she deemed inadequate:

    a.     She expressed concern that he appeared to be stagnating in reading skills, and staff responded that, in their experience, students often remained at the same level for long periods of time in the curriculum that had been adopted, which did not accommodate for differentiated instruction for students who, like C.B., had much better decoding than comprehension skills.

    b.     She expressed concern that the substitute replacing his math teacher during her maternity leave did not seem to be working on his IEP goals.

    c.     She expressed concern that C.B., whose IEP indicated he was getting "general education" for science and social studies, did not appear to have a curriculum and seemed to be doing only a few relevant activities.

    d.     As a general education reading specialist, B.B. did her best to help C.B. academically. She relied heavily on school to teach social skills and to provide opportunities that she could not—such as opportunitiesto interact with other children on a sustained basis in a safe setting.

    e.     In spring 2017, Ms. Bennett asked Cove to improve C.B.'s social work services.

    f.   She expressed concern that during social work he was playing games designed for young children rather than learning to converse with peers. A new social worker was assigned, who introduced far more appropriate activities; however, B.B.'s request for an IEP meeting in which, inter alia, appropriate social work goals should be developed was willfully misinterpreted as a reference to the annual IEP which was required to be convened in September 2017 (a meeting which Cove scheduled, but which CPS cancelled and took no action to reschedule, then or later).

    g.   Shortly after the new social worker was assigned, a white peer sent racial texts to C.B. asking what black people should be called, including one consisting of "Nigga?" B.B. and C.B. were upset. The principal responded that they wanted students to learn appropriate social "skills." The mother of the student who sent the text apologized and explained that her son had not taken his medication that day. Staff did not meet with B.B. about this incident or offer to do so. Though B.B. expressed the view that some disciplinary action was needed, staff appear to have limited their response to talking to the student, and then requiring C.B. to work with him and encouraging his mother to let them be friends and play together. When C.B. suggested as a writing prompt that students write about discipline for using the "n-word," he was told that this was something that he could discuss in private with adults. His teacher confiscated the telephone that he had on his person—which, per school rules, he was allowed to have—in case he needed to rapidly access to his mother; this upset both C.B. and B.B.

20.   Just before C.B. was to return to school with a new teacher, for what his mother expected to be a fresh start, he received a postcard from a former teacher who had been very

involved in the previous year's problems, including racial issues. The postcard asked C.B. to come by and see her. At 6:33 a.m. on August 28, 2017, B.B. sent a distraught, critical email to Cove, saying that she did not want C.B. to have further contact with the teacher and asking staff to read a book called *White Teacher* in order to better understand their own racial biases.

21.    At 7:59 a.m. that same day—responding with far more urgency than had been accorded C.B.'s and his mother's distress over the use of the n-word—Cove's Director, Sally Sover, wrote back, saying it was "so important" for C.B. to feel "comfortable" in his school, and that she would "reach out" to CPS. B.B. answered, saying that C.B.'s problems at Cove required solutions at Cove, not through CPS. A few days later B.B. learned that Ms. Sover's "reaching out" to CPS was a euphemism for forcing C.B. out of the school for which she had fought hard– one of the very few schools in the Chicago area that purported to meet needs of students with his complex LD/SLI profile. B.B. had no idea that Cove's impulsive expulsion would precipitate two years during which C.B. had almost no access to any school.

22.    What Cove had done was to give CPS 30-day notice that it would discontinue C.B.'s enrollment. B.B. requested mediation. CPS asked for her demands to determine whether it would accept mediation; she indicated that she wanted CPS to develop an individualized IEP which, among other things, acknowledged C.B.'s auditory processing disorder rather than designating him an "auditory learner." CPS declined to accept mediation.

23.    In the few days after Cove's 30-day notice, a few people within CPS (unbeknownst to B.B. until document releases shortly before hearing) started trying to figure out C.B.'s educational needs. Unfortunately, they did not ask anyone who would be able to answer their questions. After that cursory, inconclusive exchange, there was no more discussion in CPS about C.B.'s needs—or how they might have changed after two years in a theoretically intense LD

remediation environment, with compensatory and private services on top of that placement. Instead, administrators who knew almost nothing about C.B. scrambled to get Ms. Bennett to agree to something within 30 days, while ignoring her actual requests. They focused on Cove's timeline, not IDEA's requirements for annual and triennial assessments.

24.     During September 2017, CPS prevented B.B. from enrolling C.B. in his school of residence.

25.     CPS cancelled the IEP meeting which Cove had scheduled, and offered to convene a meeting at a District administrative site, but did not do so and stopped communicating with B.B.

26.     CPS told Cove, which was doing part of C.B.'s triennial reevaluation, not to complete his speech-language assessment, and did not do that assessment itself.

27.     CPS conducted nursing and psychological assessments, but did not convene a triennial "eligibility" meeting to discuss them.

28.     Instead of participating in meetings that were required to occur in September 2017, CPS's administrator, Christine Mock, suggested various possibilities to C.B.'s mother. They consisted of public school multisensory reading programs (though it was unclear to both CPS staff in internal emails and to B.B. whether such a program would be suitable for C.B.) and a program for emotionally disturbed students. B.B. indicated that she wanted an individualized IEP and did not want C.B.—a quiet child with learning and language disabilities and growing anxiety based on experiences at Cove the previous semester—thrust into a placement geared for students with emotional disturbances and behavioral disturbances ("ED/BD").

29.     CPS did not respond to B.B.'s concern about an emotional-behavioral placement, or offer any reason why such a placement would make sense for C.B. However, the only two referrals that CPS sent out—in September 2017 (after his IEP and triennial eligibility and

program review were already overdue) were to Menta and South Central Therapeutic Day School, both ED/BD placements, asking them to contact the parent and providing an outdated phone number.

30. South Central wrote to B.B., who discussed the program with its intake coordinator; upon seeing C.B.'s IEP, the intake coordinator agreed the school was not appropriate. South Central advised CPS that B.B. was not accepting the referral, and was seeking an LD placement. CPS responded "Thank you" to South Central, and its administrator stopped taking or returning B.B.'s phone calls. It is not clear what happened with the Menta referral, which the mother did not find out about until the District's disclosures for the IDEIA hearing.

31. B.B. sought records, though counsel, attempting to re-start C.B.'s education.

32. Shortly thereafter, District administrator Christine Mock sent an internal email.

33. The administrator of CPS's nonpublic school placement program asked District counsel, Elizabeth Wagman, if C.B. was on her "radar." She replied that he was not and forwarded old emails.

34. In July 2018, counsel for student forwarded recent evaluation information to District counsel.

35. CPS's placement clerk testified that in September 2018, based on awareness that B.B. was seeking placement for her son, CPS re-sent referrals for C.B. to Menta and South Central. Her understanding was that B.B. had previously rejected both schools, though in fact she had never learned of the Menta referral. B.B. did not receive referrals in September 2018.

36. In October 2018, she requested through counsel that C.B. be permitted to attend Acacia, an LD school that was far more similar to Cove than the ED/BD schools CPS had previously mentioned.

37.     Elizabeth Wagman responded that Acacia could be considered if and only if the parent agreed to transport him during the duration of any attendance there, as it was not currently on a bus route. She offered "Parkland," to which there was a bus route. Student's counsel sent Ms. Wagman an address to a place called Parkland and asked whether it was the place being referenced. Ms. Wagman did not answer.

38.     Shortly after this correspondence, unbeknownst to the family or their counsel, the new head of nonpublic school placements looked at C.B.'s file, noticed that he was an LD student with internalizing emotional issues (anxiety), and made two referrals—to Hopewell and Acacia. Hopewell apparently did not respond, and Acacia indicated that it had a program that it believed could meet C.B.'s needs. It did not accept C.B.—who had not yet applied—but rather accepted CPS's referral for consideration. Acacia offered to reach out to the family, but B.B. did not receive any contact.

39.     In November 2018, after B.B. requested an Independent Educational Evaluation ("IEE"), which in CPS automatically triggers a District due process filing, CPS claims to have generated a letter offering Acacia. B.B. did not receive that letter until December 20, 2018 when CPS's former counsel revealed its existence to her counsel and then sent it over.

40.     By the time B.B. received the Acacia letter (which constituted a formal offer by CPS, but did not preempt Acacia's own application process), she had already enrolled C.B. at Gary Comer Middle School, where he entered as a sixth grader because there was an opening in that grade, and he had not been in school for over a year.

41.     Gary Comer staff initially planned to assess C.B. and develop an IEP. However, CPS directed them to slow-walk that process, and ultimately, on February 19, 2019, to dismiss C.B., effective the very next day.

42. CPS persuaded the IHO that "stay put" was Acacia, even though its agent for special education Gary Comer had accepted C.B., he remained there for weeks with CPS's knowledge, he had never attended Acacia, and Acacia was being unresponsive to his mother's overtures. The IHO disregarded student's legal arguments—that students have a right to enroll in charter schools irrespective of disability status, that stay-put is a protection for parents, not an obstacle to unilateral decisions by them, and that CPS had agreed to allow C.B. to attend Gary Comer.

43. The IHO looked solely at C.B.'s "last implemented IEP"—even though that IEP had occurred over two years earlier and was grossly out of date. She viewed generation of a letter saying that CPS was willing to place C.B. at Acacia as sufficient even though there was no evidence that Acacia was willing or able to implement his existing IEP, or for that matter to accept him. The IHO suggested that CPS could assess C.B. and update his IEP even with due process pending, but did not order it to do so and created a situation in which CPS was able to elude any responsibility whatsoever for C.B.'s education by offering an illusory placement at Acacia.

44. The ISBE due process system has already had its say as to C.B.'s education from February 20, 2019 to May 7, 2019 even though plaintiffs have not pursued due process with respect to that period, Unfortunately, its role was to allow exclusion from an inclusive program in which he was doing well—and could have done far better had special education supports been added—and to allow CPS to rely on its ostensible willingness to fund a private placement that did not make itself available. In making that ruling, the IHO credited false representations regarding the availability of Acacia and the supposed limits of the charter school program— which were made casually and in some cases orally, not under penalty of perjury, by the District's lawyer, while disregarding sworn declarations by parent and parent's counsel which

were supported by documentation.

45.    Student theoretically has IDEA claims for the period from January 7 through February 20, 2019 which have not been exhausted, affected by ISBE's hearing officer, or waived via interim agreement. He should have been able to enter Gary Comer with a current IEP, not an expired, out-of-compliance IEP. Actually, though, this was a comparatively excellent time in C.B.'s education. He got to take classes in all subjects, including science and social studies. He was allowed to access general education, comprehensive, close-to-age-appropriate curricula in math and literacy. Though he was not in special education, Comer did skills testing to identify next steps for instruction. Most importantly for C.B. and B.B., he was no longer confined to his home, in a neighborhood with little access to peers even after school. He was making friends, and learning in groups. The problem with C.B.'s initial weeks at Gary Comer is not what happened during them—it is that CPS abruptly and dishonestly ended his time there. Student and parent seek no remedies for the January 7, 2019 to February 20, 2019 period.

46.    In May 2019, with the IDEA hearing imminent and CPS urgently seeking a continuance, C.B. was able to secure a return to Gary Comer via an interim agreement.

47.    When he arrived on the agreed day, May 7, 2019, he was turned away because CPS had not notified Gary Comer of the change in its stance.

48.    Later that day, C.B. was allowed to return to school, under an interim agreement that called for prompt assessment and development of an Individualized Education Program before the start of school.

49.    At a prehearing conference on August 28, 2019, the IHO set hearings dates of September 10-13, 2019. Had CPS complied with the interim agreement, an IEP meeting would have been held before the start of school in August 2019 and new District assessments would

have been available for consideration at hearing.

50. CPS did not comply, and it offered to have an IEP meeting for C.B. on September 11, 2019. The IHO was willing to suspend the hearing for that day, if the parties could agree on a day later in the month, but absolutely refused to allow any hearing dates beyond September. CPS's counsel vigorously objected to weekend dates and claimed to have only one available day in September, which the IHO said was the day she could not do. Student/parent counsel offered to make any date work so that the IEP meeting would not be further postponed.

51. The IHO informed the parties that if CPS did not attend the hearing on September 11, 2019, she would proceed in absentia as to its IEE case, and if the parent and her counsel did not attend, the parent's educational placement and services case would be dismissed.

52. Both parties sought continuances. CPS argued that it was short of lawyers and some were on maternity leave, and protested that it was being "forced" into hearing. Parent counsel pointed out that she could not meet the IHO's demand for a detailed schedule of what compensatory education services should be ordered, to occur when, without knowing what Gary Comer would provide as part of C.B.'s IEP. Parent counsel indicated that she had severe sciatica pain, which had started on July 27, 2019 in a housekeeping "accident," and that she would likely be substantially more functional if a brief continuance were granted. Parent counsel pointed out that had CPS complied with its agreement, a current IEP and new assessments would be in place and available, respectively, before hearing. Parent counsel pointed out that the District had violated records production requirements, and asked for time to secure full records before entering hearing. The IHO mischaracterized the continuance request, claiming that both sides were saying that issues might be resolved in an IEP meeting, which neither side had said, and that they were seeking additional time for settlement negotiations, which was not the basis for

either side's continuance request. The IHO explained at the end of hearing, when family counsel requested a weekend to supply written argument on the grounds that she had been unable to work normal litigation hours during the hearing, that IDEA does not specify that illnesses on the part of counsel are good cause for continuance. The IHO disregarded her obligation to consider common sense, basic fairness and civil procedure principles in evaluating continuance requests.

53.    Hearing occurred September 10-13, 2019. Counsel for C.B. and B.B. requested an opportunity to provide a brief on Monday, September 16, 2019. CPS opposed that request, and the IHO denied it. The record closed on September 13, 2019, making the decision due on September 27, 2019. Decisions in Illinois are routinely emailed by hearing officers to parties or counsel and mailed. Student's counsel received no email on September 27 and received a US mail package on September 30 containing the decision and a proof of service indicating that it had been emailed on September 27. The envelope containing a postmark was discarded without inspection by student's counsel. This appeal is timely even counting the decision to have arrived when the IHO represented that it did, on September 27, 2019, rather than on the date of actual receipt, September 30, 2019.

54.    Finally, on October 9, 2019, an IEP meeting occurred at Gary Comer, C.B.'s first since September 23, 2016.

55.    C.B.—long a hardworking and conscientious student—remains at Gary Comer, where he has a 3.9 GPA.

**CLAIMS FOR RELIEF**

—COUNT ONE—

Against Chicago Public Schools, District 299 Board of Education

*Individuals with Disabilities Education Improvement Act of 2004*

56.    Plaintiffs reallege paragraphs 1 through 55. The educational opportunity created by IDEA is protected by an administrative hearing and judicial process that is available to a parent or student dissatisfied with the identification, assessment, or educational program offered by the local educational agency. 20 U.S.C. § 1415.

57.    The IHO made the following factual, legal and procedural errors:

a.    The IHO misstated testimony by witnesses. For instance, the IHO reported that CPS places students in separate day schools certified to address all of their special education eligibilities. In fact, District staff testified that they match the primary eligibility, not necessarily all eligibilities as required by Illinois law. Dr. Goldstein, an expert witness on student's behalf, testified that Cove School had a good reputation for working with white students with learning disabilities. The IHO, who had repeatedly barred references to race, took out "white" in reporting that comment.

b.    The IHO reached adverse and false conclusions regarding parental conduct that were unsupported by any evidence, or even assertions that there was supporting evidence. For instance, no witness claimed that B.B. refused to meet before or following his exclusion from Cove or that she refused to make him available for assessment. No witness claimed that she refused to come to Cove and District staff acknowledged discussing an alternate meeting site, which she preferred. The IHO found that B.B. had "refused" placements which CPS did not even claim to have offered or suggested to her.

c.    The IHO ignored the IEP team's duty to discuss the student's needs. Offering District

multisensory programs without discussing whether District professionals thought they would be appropriate did not meet this obligation.

d.  CPS uses a pervasively illegal process of having administrators to whom have parents have no access make actual school determinations; the IHO failed to challenge that practice, accepting that therapeutic schools with designated eligibility categories are interchangeable even though they vary tremendously and some are sought by parents while others are often resisted.

e.  While claiming to eschew labels and demand individualization, the IHO found that each and every placement mentioned by CPS was appropriate, because she incorrectly thought that each of them was certified to serve students with a dual eligibility of specific learning disability and speech/language impairment.

f.  Though the IHO found that each placement mentioned by a CPS staffer to the parent, mentioned internally, asked to reach out to the family, or actually put in touch with the family could implement the student's IEP, there was no evidence of that with any placement, even Acacia, tendered according to CPS at the end of November 2018 and according to the parent at the end of December 2018. Acacia thought it could likely meet C.B.'s needs, not necessarily implement his long-expired IEP. There is no documentation that previous suggestions thought they could meet needs, much less that any of them could have implemented his IEP.

g.  The IHO accepted an unlawful practice which CPS witnesses treated as routine: refusing to convene IEP meetings or assess students if they were not currently in a CPS-funded program. There are many instances in which CPS staff need to assess students who are not currently in District-funded programs—children coming from

home schooling by families, children in religious and other private general education schools seeking special education services, preschoolers, etc. School-age children in educational crisis form no exception to the obligation to conduct annual IEP meetings and triennial reviews.

h. The IHO found that the parent had "refused" therapeutic day school because she was requesting learning disability and language focused programs, as the IHO conceded were required by her settlement agreement, and resisting relegation of her quiet, extremely well-behaved, sensitive son to programs designed for students with severe externalizing behaviors.

i. The IHO credited vague testimony by CPS and Cove staff about what probably happened over specific testimony by about what did actually happen in her son's case. She treated the parent's testimony as completely worthless, without explanation of why she was dismissing that testimony.

j. The IHO repeatedly mischaracterized arguments on behalf of the student and parent—arguments which she refused to allow to be presented in written form even though family counsel offered to do so in a few days. The family did not argue, for instance, that the Woodcock-Johnson had been administered in a racially discriminatory fashion. Rather, they requested that CPS be required to meet its burden of proof as to the adequacy of its assessment, and raised numerous issues—some of which the IHO ignored entirely—as to potential deficiencies in the assessment. The IHO did not require testimony from actual assessors or any information about their qualifications or test administration, but simply at times credited the CPS school psychologist's representation that it was sufficient to rely on Cove assessors, while

conflating historical discussions of assessments with current discussions in a way that
expanded the scope of

k.  The IHO frequently failed to understand arguments being submitted on student's
behalf, and created that situation by refusing to allow briefing and requiring
compressed oral argument at a time when student's counsel was in visible, and
verbalized, physical pain from a recent injury resulting in sciatica.

l.  The IHO's decision was riddled with factual and legal errors. Though family counsel
asked CPS to supply a transcript shortly after the hearing concluded, none has been
provided. Additional problems will be cited in a motion for judgment on the
pleadings.

m.  The IHO excused failures by CPS to timely offer an appropriate placement (which
resulted in the student being out of school for approximately a year and a half) by,
among other problems: conflating referrals to schools with offers of placement;
conflating school suggestions, some internal to CPS, which were made over an
extended time frame as though they were all available to the student at any time but
for the parent's failure to accept them; ignoring CPS's failure to communicate with
the parent; and misstating CPS's own account of its processes in referring students to
separate day schools.

n.  The IHO erred in finding the District's assessment appropriate by ignoring evidence
that the assessor did not understand the information from other sources that she put in
her report.

o.  The IHO erred in finding the District's assessment appropriate by ignoring evidence
that the assessor omitted important information from school speech and language

testing.

p. The IHO vitiated IDEA by determining that CPS's failure to conduct a timely three-year assessment was excused by his mother's subsequent decision not to put him in a separate day school that both she and the school's staff deemed unsuitable pursuant to an expired IEP.

q. The IHO vitiated IDEA by determining that CPS's failure to conduct a timely annual review and develop a current IEP was excused by his mother's decision not to accept a placement that CPS claimed was consistent with his expired IEP.

r. The IHO erred in making harsh, implicit credibility determinations against the parent with no explanation. For instance, B.B. gave specific testimony about gaps in C.B.'s program that were "countered" by vague testimony by Cove staff about what they think tends to happen in their school. The IHO dismissed concrete, specific testimony by B.B., even though the District put on no evidence by individuals with direct knowledge of relevant aspects of his program.

58. The IHO erred legally in these, among other respects:

a. C.B. was a student in crisis at the beginning of the 2017-18 school year. His education at Cove had gone downhill, and then the school gave notice that beginning in 30 days (later slightly extended), he would no longer be able to attend. His IEP expired in September 2017 and his triennial reevaluation was due that same month. Though C.B. was at school throughout September 2017, and fully available for belated assessment thereafter, and his mother was available for an IEP process and was actively requesting an IEP meeting; nonetheless CPS cancelled normal, critical special education processes because when it finally offered alternative placement

(after the IEP had expired and the triennial was overdue), B.B. did not place him in a program for students with emotional and behavioral disturbances, which appears to have been selected because it was close to his home on the South Side of Chicago and convenient for the District from a transportation perspective.

b. The IHO erred in determining that the fact that the parent and District were in disagreement over placement negated the District's duty to conduct a triennial assessment.

c. The IHO erred in determining that race-based harassment and maltreatment were irrelevant to whether Cove constituted a free appropriate education for C.B.

d. The IHO erred in determining that CPS was entitled to completely ignore a parental request in early calendar year 2017 for an IEP process to discuss problems at Cove, even though Illinois law requires that districts respond to requests for IEP meetings within 30 days.

e. Family counsel argued that the September 2016 and subsequent IEPs should have accurately reflected social studies and science instruction, rather than falsely stating they occurred in general education. The IHO accepted CPS's excuse that this vast gap between the IEP and reality reflected a computer issue, and that the parent knew he was not going to be in general education. The IHO accepted the vague assertion of a peripherally involved CPS administrator tasked with liaising with Coe that while C.B. was not in general education, the school provides grade-level curriculum, rejecting the parent's testimony that he did not. That was not a claim supported by testimony from anyone at Cove. B.B. was treated as a completely useless, or lying, witness, with no explanation of why that determination was being made.

f. Over and over, the IHO excused District failings without acknowledging or taking into account that they were the result of other District failings. For instance, the IHO found that had the parent talked about anxiety, the school psychologist would have assessed it. The problem is that the District ignored information available to it about anxiety following the "nigga" incident, and the school psychologist had no idea that he was about to be forced out of the school he had attended since 2015 due to his mother's complaints about handling by the school of racial issues. The IHO found that longstanding ADHD/inattentive type presentation might still be present, but found that CPS had no need to assess that, because they would have done so, had they convened an IEP meeting, which they did not, and which the IHO thought was acceptable because the parent had not gone along with the plan to put C.B. in a school near his home, on a bus route, that served students with such significant emotional and behavioral disturbances that their school districts were willing to, or were pressed by parents to, tuition them out to separate day schools.

g. The IHO imagined that meetings happened which did not and found that the parent's "conduct" in these nonexistent meetings reduced her son's special education rights. Specifically, there was not an IEP meeting in February 2017 though the IHO thought that a meeting had occurred to add extended school year (summer) services; the document suggests, and witnesses confirmed, that there was no meeting. There was not an assessment planning meeting in September 2017. That was done by email exchange, and the school psychologist opted not to interview the parent or review records as to his current educational predicament—facing exclusion, or as the IHO called it, "release" from the learning disability school he had been attending since

summer 2015.

h. The notion that the IEP team "discussed" a less restrictive environment is dubious at best, and the idea that continuing academic gaps precluded return to a District placement is legally flawed given criteria for outplacement to settings which offer no access to nondisabled peers.

i. The IHO partially recounted, and confused, testimony about the Wilson program. The parent did not resist using Wilson at Cove, nor was methodology her choice in any case. She asked about Wilson training and school staff told her falsely that C.B. was not old enough. Once his decoding had improved, in September 2017, she doubted that Wilson was appropriate, as its main focus is on decoding. CPS staff discussed Wilson for C.B. among themselves without reaching a conclusion and without reaching out to the parent or Cove to see whether C.B. was already in this program. CPS offered consideration of Wilson multisensory classes in September 2017, but did not recommend them, nor did CPS convene an IEP meeting to share information about Wilson of the type that the parent received in September 2019 from an expert witness during an IEP meeting—information that if provided earlier might have changed her opinion, depending on whether District programs were even using the comprehension and fluency portions of Wilson that student expert Dr. Caroline Bailey recommended. The District's failure to convene an IEP meeting, and offer information about what it was considering, cannot be excused by the fact that an expert witness later testified that had the program been done in full, it might have benefitted C.B.

59. The IHO mishandled procedural aspects of the hearing:

a. Though the District had the burden of proof as to the adequacy of its assessment, the IHO disregarded its failure to meet that burden, and excused its failure to complete C.B.'s triennial assessment as well as its failure to convene an IEP meeting to discuss the truncated portion of the assessment that had occurred.

b. The IHO based hearing scheduling on a rigid determination to stick to a schedule she had set in June 2019, even though circumstances in August 2019 warranted a continuance for the benefit of the student, parent, District, and student counsel. The District also protested (far more vehemently) scheduling determinations that ignored the District's continuance requests based on a disproportion between its legal staff and the number of hearings confronting, or initiated by, CPS.

c. Illinois law makes clear that when families and school districts agree not to conduct a hearing at a particular time, that decision must be honored. Yet the IHO distorted this rule, claiming that though the parties could agree on a continuance, she could decide to schedule their hearing at a date that both opposed.

d. The IHO refused to allow post-hearing briefing, rejecting even a request for a few days so that student's counsel, who was temporarily incapable for medical reasons of working normally, could prepare a written argument during the weekend after hearing. After repeated requests for this simple accommodation for a temporary disability, the IHO indicated that IDEA does not specify that counsel's medical condition is a relevant factor. IDEA allows for continuances for good cause; the request for a few days to brief this case in writing was not even a request for a continuance.

e. The IHO ignored case law submitted by student in response to her demand that the

parties submit cases they deemed relevant.

f. The IHO repeatedly demonstrated bias. For instance, after insisting on convening hearing on a day on which C.B.'s school had scheduled an IEP meeting, she announced that if the parent skipped hearing to attend the IEP meeting, her case would be dismissed, while if the District failed to appear, she would proceed with them in absentia.

g. Frequently during hearing, the IHO functioned as another lawyer for the District. She repeatedly made what she called her own "objections" to proper questions by student's experienced counsel, and then announced that she was "sustaining" her own objections.

h. The IHO made an improper determination regarding stay-put—allowing CPS to dictate removal of C.B. from a District-affiliated charter school to which he had been admitted following full disclosure of his disability and dispute with CPS, and ordering that student's "stay put" placement was a program he had never attended, which had not accepted him, and which was not responsive to his mother's inquiries—and allowing CPS to use stay put illegitimately as a sword to bar unilateral placement in a charter school. That decision resulted in months with zero public education and in a sharp reduction of student's bargaining power to pursue a free appropriate public education.

i. In allowing the procedural protection of stay put to be weaponized against the student's status quo placement and his parent's procedural rights, the IHO refused to engage with the arguments presented by student's counsel, and ordered student's counsel to stop making such arguments.

—COUNT TWO—
Against Elizabeth Wagman and Christine Mock

*Individual Liability for Substantive and Procedural Violations of the*

*Individuals with Disabilities Education Improvement Act of 2004*

*Pursuant to 42 U.S.C. § 1983*

60.    Plaintiffs repeat and reallege Paragraphs 1 to 59 and incorporate them herein by reference.

61.    A claim under 42 U.S.C. § 1983 allows a person to seek redress against a government actor, or a person acting under the color of state law, for violations of the constitution, state and/or federal law that result in harm.

62.    The Seventh Circuit has indicated that Section 1983 may be available to address IDEA violations.

63.    CPS receives funding for special education through a combination of federal flow through funds, state and local funds.

64.    A relationship existed between C.B. and the individuals who made decisions regarding his education from January 25, 2018 through the present. As it does not appear that teachers had any role in his education, or that assessors were responsible for convening IEP meetings, the administrators and lawyers who did retain control of his education had an affirmative duty to ensure that received a free appropriate public education throughout that period.

65.    This included the duty to make school assignment referrals that were based on the C.B.'s needs as determined by his IEP team, not merely based on one or both of his eligibility labels or based on irritation at his mother.

66.    Wagman and Mock ignored plain requirements under IDEA to conduct an IEP meeting

and review of C.B.'s triennial assessment.

67. On information and belief, Wagman and Mock refused to make appropriate referrals to schools focusing in remediation of academic and language skills for students with speech/language impairments and specific learning disabilities, and instead caused there to be made inappropriate referrals to schools for students with disruptive behaviors and emotional disturbances.

68. Wagman and Mock treated C.B. differently than they did other students with and without disabilities and did so under color of law.

69. Wagman and Mock responded to B.B.'s dissatisfaction with its placement referral by purporting, in February 2018, to disenroll him from CPS.

70. In summer 2018, Wagman responded to an effort to reinstitute services for C.B. by indicating that the District would be willing to mediate, but not by ensuring that an IEP was convened.

71. In October 2018, in response to a request for placement at a specific school oriented to students with learning disabilities, Wagman replied that that school could be considered if the parent would agree to transport for the duration of any placement there, otherwise he could attend an emotionally and behaviorally focused school with bus transportation because there was an existing bus route.

72. Wagman apparently initiated an exploration of making Acacia available with transportation, but the District did not generate a referral letter until November 2018 and did not communicate that proposal to the parent until December 2018, via counsel at a status conference in the due process cases that the District and parent had recently filed.

73. In January 2019, Mock became aware that C.B. was attending Gary Comer Middle

School, a charter school affiliated with CPS. She took action along with District counsel, probably including Elizabeth Wagman, to cause Gary Comer to disenroll C.B., which became effective February 20, 2019. That was intended to, and did, create enormous pressure for C.B. and B.B. to abandon the pursuit of compensatory education for C.B.'s year-plus with no public education. Nonetheless, the family took what was available at Gary Comer and continued to pursue their rights with respect to the October 2017 to May 2019 period.

74.    Throughout early 2019, CPS failed and refused to assess C.B. or to hold an IEP meeting to discuss his current educational needs; these failures and refusals were designed and implemented by Mock and Wagman. Mock directed Gary Comer staffers to cease their legally required, appropriate efforts to begin assessing C.B. and updating his 2 ½ year old Individualized Education Program.

75.    Many of Wagman's actions in this matter were not in her capacity as a lawyer but were administrative roles in which she unilaterally made decisions that should have been made by an Individualized Education Program team which was by law required to contain the parent, a teacher of the child and a person capable of interpreting assessment data. The only role that was filled in decision-making was that of administrative representative, and Wagman and Mock both played that role.

76.    These actions individually and combined by Mock and Wagman were taken with deliberate indifference towards C.B.'s status as a student with a disability, in violation of CPS's own policies and clear legal requirements, had no relationship to any legitimate educational or other objective, were in violation of clearly established law, and served to cause ongoing and substantial harm to him.

—COUNT THREE—
Against ISBE

28

*Section 1415 (f)(3)(A) of the Individuals with Disabilities Education Improvement Act of 2004*

77. Plaintiffs repeat and reallege Paragraphs 1 to 76 and incorporate them herein by reference.

78. IDEA requires Illinois to provide a hearing officer who does not have "a personal or professional interest that conflicts with the person's objectivity in the hearing," and who possesses "knowledge of, and the ability to understand [federal and state special education law and court decisions]… the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and … the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice." 20 U.S.C. § 1415 (f)(3)(A).

79. ISBE is responsible for hiring, firing, training, monitoring, and providing corrective feedback to hearing officers.

80. IHO Maxwell-Wickett has attempted to fit adjudications critical to the future of students with disabilities into her private practice and family life in ways that in more than one case have prejudiced the rights and interests of parents as well as school district.

81. IHO Maxwell-Wickett has issued decisions containing extreme legal errors—for instance, citing case law to the effect that assessments must comply with all applicable regulations while ignoring evidence about whether particular assessments in fact did so.

82. IHO Maxwell-Wickett has a history of discounting expert testimony for irrelevant reasons and reasons which are proscribed under the Illinois and Federal Rules of Evidence. In this case, she appears to have relied on a "gotcha" maneuver by CPS counsel—pulling up an old credential which was not on an expert witness's CV and which he has not used in many years— and writing her decision as though he had misrepresented that credential, even though what emerged was that he viewed the credential as "on hold" because he could reinstitute it at any

time in the unlikely event he might need it, rather than as "lapsed," the semantic formulation pushed by CPS.

83.    The IHO set a time frame for hearing which was overly short, over plaintiffs' objections and in keeping with CPS's preference for fewer witnesses and less documentary evidence. That restriction limited the family's ability to subpoena District and Cove witnesses. It also limited time for the parent's presentation of information about her attempts to secure services from CPS and about the reimbursements which she sought.

84.    The IHO required parent/student counsel, disproportionately, to provide a great deal of information in anticipation of hearing about planned arguments and evidence. In making her decision, the IHO ignored some of those arguments, substituting straw man arguments.

85.    The IHO required the family to submit a compensatory education request and the parent submitted detailed expert recommendations for compensatory education. Those requests were supported by detailed reports. At hearing, the IHO indicated that she would discount reports unless information was provided orally—cutting drastically into other expert testimony. Counsel opted to protect the record by introducing information rather than having witnesses read or summarize their recommendations.

86.    Though the IHO indicated her plan to follow the Seventh Circuit's "qualitative" approach to compensatory education, she in fact demanded a highly specific quantitative showing which the District's failure to report or monitor performance made it impossible to fulfill. This does not appear to have been outcome-determinative, as the IHO blamed the parent for C.B.. being out of school almost entirely from early October 2017 to early May 2019, and thus did not reach the issue of compensatory education. If this matter were to be remanded, it should be with instructions to apply a realistic standard to testimony about compensatory

education rather than requiring that a child barred from school for about a year and a half prove precisely what would have happened had he been allowed to attend a CPS or CPS-contracted program.

—COUNT FOUR—

Against Chicago Public Schools, District 299 Board of Education

*Violations of Section 504 of the Rehabilitation Act*

*29 U.S.C. § 794 – Disability-Based Discrimination*

*(Demand for Jury Trial as to Liability and Damages)*

87.    Plaintiffs repeat and reallege Paragraphs 1 to 86 and incorporate them herein by reference.

88.    C.B. is a student with a speech/language impairment and a specific learning disability which adversely affect his ability to learn and communicate. As a result, C.B. meets the definition of a person with disability under Section 504 of the Rehabilitation Act.

89.    Chicago Public Schools is a covered entity under Section 504 by virtue of its receipt of federal funds.

90.    In violation of Section 504, C.B.'s educational needs were not met by CPS as adequately as the educational needs of nondisabled students. Chicago Public Schools is a district with a mixed record in serving students generally, but it is improving in some areas, and has denied C.B. the benefits of those improvements. CPS has adopted Wilson multisensory reading remediation for students with specific learning disabilities, but Cove refused to provide that service, or any other specialized remediation, for C.B. CPS regularly provides science and social studies instruction for all students, including those with language impairments and reading disabilities, but invites separate day schools to mischaracterize these fields as "general

31

education" classes and does not require any progress monitoring or, for that matter, instruction. At the very least, CPS allows most 12-, 13- and 14-year-old children to be in school, with peers. Because of CPS's acts and omissions, C.B. has missed far more than a year of school since September 30, 2017. CPS does not generally force students into environments dominated by peers with emotional and behavioral disabilities unless those students themselves have such problems and are seen as requiring specialized services provided in environments primarily composed of such students.

91.    In violation of Section 504, CPS made no efforts to ensure that C.B. was in school, or being educated, at all. As his mother sought legal help and tried to find activities for C.B. once CPS dropped his annual IEP, his triennial assessment and his placement, she anticipated truancy action, which might have helped re-start C.B.'s special education. None occurred.

92.    CPS knew that its actions violated C.B.'s rights, and even minimal thought would have made clear that its abandonment of this student would adversely affect his education and mental health. The District by its actions and inactions set forth above violated and continues to violate Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), and the regulations promulgated thereunder, 34 C.F.R. Part 104, by denying a free appropriate public education pursuant to Section 504 and its implementing regulations as well as discriminating against Plaintiffs on the basis of C.B.'s disabilities.

93.    As a direct and proximate result of the District's violation of Section 504, C.B. faces sharply reduced prospects for success in education, employment and community living, and C.B. and his mother has suffered physical symptoms, anxiety, mental anguish, emotional distress, lost earnings, out-of-pocket costs, and damage to reputation, social and educational development and personal relations, in an amount to be ascertained according to proof at trial. Staff acted in some

cases knowingly, and in other instances with reckless disregard for the impact of their acts and omissions.

—COUNT FIVE—

Against Chicago Public Schools, District 299 Board of Education

*Violations of Section 504 of the Rehabilitation Act*

*29 U.S.C. § 794 – Retaliation for Disability-Related Advocacy*

*(Demand for Jury Trial as to Liability and Damages)*

94.  Plaintiffs repeat and reallege Paragraphs 1 to 93 and incorporate them herein by reference.

95.  C.B. is a person with known and ongoing language impairments, specific learning disability, and ADHD/inattentive type. These disabilities substantially limit major life activities including academic study, language development and socialization. As a result, C.B. meets the definition of a person with disability under Section 504 of the Rehabilitation Act.

96.  C.B.'s mother, B.B., has advocated on his behalf since he entered the District.

97.  CPS is a covered entity under Sec. 504 by virtue of its receipt of federal funds.

98.  The District has retaliated against C.B. and his mother in the following respects:

  a.  The District actively refused to meet with C.B.'s mother to discuss his education from September 2016 through December 2016. It rejected her IEP requests and her mediation request in September 2016. It failed to convene required annual and triennial IEPs in September 2017, instead making referrals pursuant to an obsolete IEP in September 2017 and, according to its own clerk's sworn testimony, making exactly the same rejected referrals again the next year. When contacted by student's counsel on, CPS did not convene an IEP meeting.

b.  The District has utterly eliminated teachers from educational decision-making for C.B. at all times during the past two years. Its counsel falsely claimed at hearing that B.B. did not want to have an IEP meeting with Cove teachers. Someone, likely District counsel, decided to cancel the IEP meeting in which B.B. anticipated those teachers would report on progress towards goals and make recommendations for future placement.

c.  The District has utterly eliminated evaluating professionals, such as the school nurse and school psychologist who assessed C.B. in September 2017, and the speech/language pathologist who should have done so as well at that time, from educational decision-making since September 2017, when his annual and triennial IEP reviews were both due.

d.  Though Cove was ready to help try to shield C.B. from the impact of its decision to "release" (the IHO's euphemism) C.B. due to his mother's protest of its handling of racial issues, CPS rejected that input.

e.  Months after hearing, on December 5, 2019, B.B. received an email from an unknown person at CPS indicating that C.B. was enrolled at her school and she needed further information. B.B. responded by asking who she was and what school she was from. She replied that she was "the case manager at Nancy B. Jefferson which is the CPS school located within JTDC." C.B. has never been in the Juvenile Temporary Detention Center nor has he presented with any significant behavior challenges. One of the focusses of hearing was his mother's request that he be referred to a school for students with specific learning disabilities and language impairments rather than, as CPS did from October 2017 to the end of November 2018, schools designed for and

very predominantly attended by students with emotional and behavioral disturbances. B.B. attempted to follow up, but the case manager did not respond. This episode was illustrative of CPS's handling of this matter and caused needless distress to B.B.

99.    The District by its actions and inactions set forth above, has violated and continues to violate Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), and the regulations promulgated thereunder, 34 C.F.R. Part 104, by retaliating against C.B. and his mother because of advocacy on his behalf.

100.    As a direct and proximate result of the District's retaliatory practices that have blocked necessary communications related to his education and slowed service and equipment provision, violating Section 504, C.B. faces sharply reduced prospects for success in education, employment and community living, and C.B. and his mother have suffered and continue to suffer injuries, pain, anxiety, mental anguish, emotional distress, lost earnings, out-of-pocket costs, and damage to reputation, social and educational development and personal relations, in an amount to be ascertained according to proof at trial. Staff acted knowingly in treating C.B. and his mother adversely because of her efforts to advocate on her son's behalf.


—COUNT SIX—

Against Chicago Public Schools, District 299 Board of Education

*Violations of the 14th Amendment to the Constitution of the United States –*

*Discrimination based on race*

*Pursuant to 42 U.S.C. § 1983*

*(Demand for Jury Trial as to Liability and Damages)*

101.    Plaintiffs repeat and reallege Paragraphs 1 to 100 and incorporate them herein by reference.

102. The 14th amendment of the Constitution of the United States prohibits discrimination based on race. It is enforceable via 42 U.S.C. § 1983.

103. C.B.'s mother, B.B., has advocated on his behalf since he entered the District.

104. CPS has enabled racially discriminatory practices by contractors and engaged in racially discriminatory practices of its own.

105. CPS relies on separate day schools to serve some students with language impairments and specific learning disabilities.

106. Most students funded by CPS to attend separate day schools are placed in such schools because of behavioral and emotional disturbances, often because teachers and administrators seek such placements in order to avoid dealing with challenging behaviors on public school campuses.

107. Only a few schools—Cove, Hyde Park Day School, Summit, and Acacia—specialize in educating students with specific learning disabilities. Even rarer are schools certified to serve students with learning disabilities who, like C.B., have an eligibility of speech/language impaired.

108. CPS takes the position that therapeutic/separate day schools can do whatever they want. CPS does not control their admission or "release" decisions.

109. Cove has a long-standing problem in providing an appropriate environment for, and educating, black students with language-based learning disabilities, and in dealing with their parents, particularly if they are also black. The IHO refused to allow into evidence any information about racial issues at Cove—information that CPS claimed was irrelevant. B.B. was trying to make Cove work for her son. CPS not only did not support her in that endeavor, but made no effort to push back against Cove's impulsive dismissal or to figure out what if any

implications that severe educational disruption had for future placements.

110.  B.B. asked for a referral to Hyde Park Day School. CPS failed and refused to make that referral, which would have made a great deal of sense for this STEM-oriented student living in South Shore. Ultimately, HPDS did not accept C.B. when B.B. tried on her own to pursue admission. HPDS is an outstanding program for students with learning disabilities who despite those disabilities do very well on racially biased, verbally loaded IQ tests, but it discounts nonverbal IQ score as well as alternative measures of verbal competence. HPDS also declines to provide free/reduced price lunches. HPDS, though certified to educate students with disabilities, appears to prefer privately funded students, for whom CPS's educationally irrelevant paperwork is not required. The impact of HPDS's policies is that this excellent, South Side program is far less accessible to black students who live nearby and whose parents cannot privately fund services than it should be.

111.  When Cove excluded C.B., and CPS took no action to preserve his place there, it considered other schools based on their distance from his home and apparently based on existing transportation routes. The result was that the schools to which CPS sent referrals, up to the end of November 2018, were schools that are designed for, and primarily serve, students with emotional and behavioral problems, in many cases problems sufficiently severe to have resulted in suspensions and court involvement. While these schools are certified to deal with learning disabilities, they do not provide research-based interventions for academic instruction for students with learning disabilities, and focus primarily on behavior management and emotional support.

112.  Chicago is an extremely segregated city. Making referrals based on location has the inevitable effect of reinforcing that segregation for students who are placed by the district in

separate day schools. For C.B., a black student living in South Shore, that meant that schools CPS preferred were the Alternate Achievement Academy and South Side Therapeutic.

113.  Chicago is a city with large wealth and income gaps between white residents and residents of color. Those gaps are reflected in superior access to educational evaluations and advocacy by white families. While B.B. is a sophisticated parent who has obtained a clear understanding of her son's disability, placing him in a school that is selected by geography and bus routes is likely to result in his placement alongside students who have not had (because their parents have not been able to get them) adequate evaluations and remediation for any learning disabilities or language impairments that they may have or for the behaviors that resulted in their separate school placement.

—COUNT SEVEN—
Against Chicago Public Schools, District 299

*Violation of the Illinois School Student Records Act*

114.  Plaintiffs repeat and reallege Paragraphs 1 to 113 and incorporate them herein by reference as against Defendant CPS.

115.  The Illinois School Student Records Act ("ISSRA") as delineated at 105 ILCS 10/1 *et. seq.* provides that a student record is "…any writing or other recorded information concerning a student and by which a student may be individually identified, maintained by a school or at its direction or by an employee of a school, regardless of how or where the information is stored".

116.  ISSRA further describes a parent and student's rights to "inspect and copy all school student permanent and temporary records…" and assures parents of access to records within 10 business days. Districts may seek extensions of up to 5 school days, which CPS never did.

117.  Despite repeated and ongoing requests from B.B. and her counsel, including as recently

as September 2019, CPS has not provided a full and complete copy of C.B.'s student records.

118.  Instead CPS has produced partial records at various points, and there continue to be gaps in records provided to the family.

119.  The ISSRA authorizes actions for injunctive relief and monetary damages in the "…Circuit Court of the County in which the school is located…" or in which the violation occurred.

120.  This Court has supplemental jurisdiction over this state court claim as it is related and forms part of the same case or controversy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court Direct ISBE to—

Remedy CPS's violations of the Individuals With Disabilities Education Act by:

1.  Receiving and reviewing the record of the administrative proceedings from the Illinois State Board of Education;

2.  Admitting exhibits improperly excluded by the hearing officer.

3.  Supplementing the record and hearing additional evidence offered by plaintiffs and other evidence as the Court deems appropriate;

4.  Reversing the IHO's Final Determination and Order

5.  Determining that CPS has violated the rights of plaintiffs under the Individuals with Disabilities Education Improvement Act of 2004 and awarding reimbursement to the extent that parents were able to provide services at their own expense; ordering compensatory education to the extent required to compensate for services which C.B.

did not receive including compensatory academic/communication/transitional/voca-

tional support and counseling to C.B. with providers acceptable to his Parents; and

ordering prospective placement and services which C.B. requires.

6. Awarding attorneys' fees and costs in the event that plaintiffs prevail.


Remedy CPS's disability discrimination and retaliation in violation of the Rehabilitation

Act of 1973 by:

1. Determining that CPS has violated the rights of plaintiffs under Section 504 of the

   Rehabilitation Act of 1973 and award monetary damages according to proof, at a jury

   trial, for emotional and physical pain and suffering inflicted on C.B. and mother as well

   as injunctive relief to prevent future denials of equal educational opportunity.

2. Awarding attorneys' fees and costs in the event that plaintiffs prevail with respect to

   Section 504 claims.


Remedy violations of the Illinois Student Records Act by:

1. Ordering CPS to produce a full and complete copy of C.B.'s student records, except

   those included in the parties' submissions at hearing;

2. Awarding Monetary Damages, attorneys' fees and costs for the willful or negligent

   violation of this statute in amounts to be proven at trial.


Grant relief under Section 1983 by:

1. Ordering Christine Mock and Elizabeth Wagman to compensate C.B. and B.B.

   monetarily for opportunities lost, time spent, emotional and physical distress

experienced, and expenses incurred in connection with their violations of IDEA's procedural and substantive provisions.

Award such other relief as the Court may deem appropriate.

Respectfully submitted,                    /s/ Maureen R. Graves

                                           Maureen R. Graves